Filed 10/19/15  In re A.R. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067707 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3753) |
| v. | |
| HUGO R. et al., | |
| Defendants and Appellants. | |

APPEALS from orders and judgments of the Superior Court of San Diego County,

Kimberlee A. Lagotta, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and

Appellant Hugo R.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant

and Appellant Rachel F.

Thomas E. Montgomery, County Counsel, John E. Philips and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

In November 2013 A.R., who was then almost three months old and is now over two years old, was removed from her father Hugo R. (Hugo or father) and mother Rachel F. (mother) (together the parents) when police found A.R. unsupervised in the father's car after he had attempted to break into a tattoo shop and then had fled the scene. The father and mother had a history of domestic violence in their relationship and the father had a substance abuse problem. As a result of the incident at the tattoo shop, the father was charged with misdemeanor vandalism and cruelty to a child by endangering her health. A.R. was placed in the home of her maternal grandparents. As of early September 2014, when the court held the contested six-month review hearing, the mother had not participated in the reunification services offered to her and the father had not made significant progress with his service objectives. At the time of the March 2015 section 366.26 permanency plan selection and implementation hearing, the maternal grandparents wanted to adopt A.R. and had taken the steps necessary to complete their adoption home study. The court terminated the parental rights of both parents and referred A.R. to the San Diego County Health and Human Services Agency (Agency) for adoptive placement.

*Contentions*

The parents separately appeal the juvenile court's orders denying their petitions for modification under Welfare and Institutions Code[1] section 388, in which they sought reinstatement of the reunification services the court terminated at the six-month review hearing. Both parents contend the court abused its discretion when it denied their petitions, asserting the evidence showed a substantial change of circumstances and that it was in A.R.'s best interest to continue her relationship with them. The father also appeals the judgment terminating his parental rights, contending the court erred because the evidence showed A.R. had a beneficial parent-child relationship with him that outweighed any need for adoption, and the court should have ordered a permanent plan of legal guardianship. The mother asserts the termination of her parental rights should be reversed if this court reverses the termination of the father's parental rights.

We conclude the court acted within its lawful discretion in denying the parents' section 388 petitions and in terminating their parental rights. Accordingly, we affirm the denial orders and the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

On November 13, 2013, when A.R. was about three months old, the father drove her to a tattoo shop owned by a friend of the mother. The father left A.R. unsupervised in his car with the windows partially open while he attempted to break into the tattoo shop. Police were dispatched to the scene. The shop owner reported that he witnessed the

_____

[1]     All further statutory references are to the Welfare and Institutions Code

father hitting a plate glass window at the shop with a paint can, knocking the window out. The father fled on foot and could not be found. Police located the father's car in the parking lot of the tattoo shop and found A.R. asleep inside the vehicle in a car seat with no pants and a wet diaper. No adults were supervising her.

The Agency investigated after it received this information. The mother admitted she and the father were involved in a domestic violence incident in late 2012 during which the father punched her in the stomach when she was pregnant and threatened to kill her and her unborn child. She also admitted the father had recently pushed her into a couch, which resulted in a bruise on her back. The mother reported the father would shake A.R. back and forth when he got frustrated, and he had left her unattended on one prior occasion. She also told the social worker who prepared the detention report that the father smoked marijuana and that she suspected he used other drugs based on his erratic behaviors in which he would "hear people talking to him like he was schizophrenic." The mother, who was still residing with father, had been declared a dependent of the juvenile court in 2011.

A. *Petition*

On November 14, 2013, the Agency filed a petition in the juvenile court on behalf of A.R. pursuant to section 300, subdivision (b), alleging A.R. had suffered, or there was a substantial risk that she would suffer, serious physical harm or illness as a result of her parent's failure or inability to adequately supervise or protect her. Specifically, the petition alleged (1) on or about and between August 2013 to the present, A.R. was periodically exposed to violent confrontations between the alleged father and the mother

4

involving the use of physical force; (2) on or about November 13, 2013, two-month-old A.R. was left inadequately attended and inadequately supervised in that law enforcement found her alone in the backseat of a vehicle without any adult supervision; and (3) the mother admitted the father shakes A.R. from side to side when he is frustrated, and he had a history of losing his temper, striking or pushing the mother, and dropping or allowing A.R. to fall and injure herself.

B. *Detention Hearing*

At the detention hearing, the court found a prima facie showing had been established that A.R. was a person described in section 300, subdivision (b). The court also found that Hugo was the presumed father and ordered A.R. detained in out-of-home care.

C. *Jurisdiction and Disposition Hearing and A.R.'s Placement with Grandparents*

At the December 2013 jurisdiction and disposition hearing, the parents submitted on the reports of the Agency's social workers. The Agency reported that A.R. was detained in a confidential licensed foster home and recommended A.R. be declared a dependent of the court and the parents receive reunification services and have separate supervised visitation with A.R.

The Agency also reported the father had explained to a social worker that his relationship with the mother had been "on and off" for two years. He claimed the mother had fabricated some of what she had reported about domestic violence in their relationship. Regarding the incident at the tattoo shop, the father said he had gone there to find the mother and saw her standing inside wearing lingerie. He said he went back to

the car to check on A.R. while he waited for the mother to come out and, when she did not come out, he went back to look and found the window curtains closed. He admitted he threw a paint can toward a window but claimed he could not remember anything else. He told the social worker he regretted leaving A.R. alone in the car and said he ran from the scene because he was scared and worried he would be arrested. He also indicated he was worried about the mother's ability to safely care for A.R.

During her interview, the mother showed the social worker proof the father was arrested for assaulting her in North Carolina in January 2013. She told the social worker she had a new boyfriend and was worried the father seeing her with another man would cause a conflict with the father.

The Agency reported that a social worker observed the father's visit with A.R. at a library earlier that month. The mother was present because she had finished her visit right before the father's began. The social worker reported that the parents walked to the back of the library and, when she observed them talking quietly to each, she told the father he was missing out on visitation time by talking to the mother.

The paternal grandmother reported the father could not be left alone and needed supervision because he suffers from attention deficit disorder and anxiety. She stated his mind was "a little bit extreme," and she was helping him be evaluated for disability payments. She also felt the mother was incapable of caring for A.R.

The Agency also reported both parents completed drug tests. The father's test was positive for marijuana metabolite, and the mother's was negative.

6

The court sustained the petition, found that A.R. was a minor described in section 300, subdivision (b), and at the mother's request set the matter for a contested disposition hearing.

Thereafter, A.R. was placed with the maternal grandparents.

D. *Disposition Hearing*

At the disposition hearing in mid-January 2014, the court declared A.R. a dependent of the juvenile court, ordered A.R.'s placement to continue in the approved home of a relative, and ordered the Agency to provide family reunification services to the parents.

The reunification case plan required the mother to participate in a domestic violence victim program, psychological evaluation if recommended by her therapist, individual counseling, and parent education. The reunification case plan required the father to participate in a 52-week domestic violence program, psychological evaluation if recommended by his therapist, individual counseling, parent education, and an outpatient substance abuse program.

E. *Six-Month Review*

1. *Initial six-month status review hearing*

The six-month review hearing was held in July 2014. The Agency recommended that the court terminate reunification services for both parents. A.R. remained placed with the maternal grandparents.

In the status review report prepared for the hearing, the Agency reported the father was on summary probation and he stated he was employed and taking classes to become

7

an emergency medical technician.  The father reported he was in contact with the mother via social media and she once came to his house drunk.

The Agency also reported the mother was not in contact with the social worker, did not participate in her reunification services, and missed seven weeks of visits with A.R.  The only service she completed was her psychological evaluation, which indicated she met criteria for a diagnosis of depressive disorder not otherwise specified and personality disorder not otherwise specified.  Therapy and psychotropic medication was recommended.

The father also completed a psychological evaluation, which revealed diagnoses of neglect of child, partner relational problem, and cannabis abuse.  The psychologist recommended that the father participate in a formal substance abuse treatment program including random drug testing, as well as psychotherapy, parenting education, domestic violence treatment; and that the father see a psychiatrist for medication.  The psychologist opined that the father had poor emotional and psychological functioning and it was unlikely he would be able to reunify with A.R. within a six-month time frame because his problems were chronic.

Regarding the father's reunification services, the Agency reported that he did not consistently attend his substance abuse treatment program.  The social worker learned he was discharged from the program on April 3, 2014.  The father eventually returned to the program but appeared to be under the influence, did not perform a drug test, and did not want to stay in the program.  The father failed to provide the social worker with the name

8

of his sponsor, proof he attended meetings, or drug test results. He failed to drug test for the Agency on June 17, 2014 and June 24, 2014.

The father completed parent training, but only minimally completed domestic violence classes by attending only 13 sessions in a six-month period. The father completed 17 counseling sessions with his therapist, who reported the 19-year-old father experienced severe anxiety and used marijuana. The father did not inform his therapist about his contact with the mother, his failure to attend drug treatment, or his failure to perform drug tests. The therapist opined that the father did not have the maturity to parent A.R.

The father visited A.R. twice per week at a library. The social worker reported that A.R. did not easily go to the father and clung to the maternal grandmother. The father did not bring a bag with food, diapers, and wipes at visits, although the social worker instructed him to do so. The grandmother reported the father had come to some visits with red eyes, and the social worker reported that he was hallucinating during one of the visits. On the positive side, the father would get on A.R.'s level to play, he was loving toward her and sang to her, he brought toys to visits, he spoke Spanish to her, and he arrived on time to visits.

The Agency's report showed the father had failed to make progress in his reunification services. He was not addressing his drug problem. He had only completed 13 sessions on domestic violence and he remained in contact with the mother. The social worker concluded that he was "not showing behavioral changes and not complying with treatment recommendations." The psychological evaluation results showed his

psychological functioning level was poor, and he had difficulty with anger, impulse control, and judgment.

The parents requested, and the court set a date for, a trial on the issue of the continuation of family reunification services.

2. *Contested six-month review hearing*

The contested six-month review hearing was held on September 4, 2014. The court received in evidence the testimony of the social worker, to which the parties stipulated, and the Agency's reports.

In an addendum report, the Agency reported the father had disclosed he used marijuana in early July, but his drug test several days later was negative. He enrolled in drug treatment again in mid-July, and in late August his treatment counselor reported that the father was attending classes but was not making progress. He was not working on his recovery steps, he fell asleep in class, he did not provide meeting verification slips, he had no drive, and nothing had changed. The father remained in therapy and attended 26 sessions and stated he needed more time to parent A.R. effectively.

The father reported he had to enroll in a 52-week child abuse class as a required term of his probation in the criminal case. The stipulated testimony of the social worker showed the father had not attended his domestic violence classes since August 23 and had missed six sessions. He had arrived 20 minutes late to his two most recent therapy sessions.

The Agency also reported that the father continued to visit A.R. and there had been some positive interactions but also some concerns. He played with A.R. and

brought toys, books, diapers and clothes. He left A.R. standing on a chair by herself during one visit, he picked at her eyes when she had pink eye, A.R. was still slow in warming up to him, and she constantly looked for her caregiver.

The mother had not visited A.R. since June 24 and told the social worker she was no longer interested in participating in reunification services.

The social worker and the father's therapist were concerned about the history of domestic violence, the parents' continued contact, and the father's inability to act maturely and maintain appropriate boundaries. The therapist expressed concern that the father's relationship with two women could lead to domestic violence.

After considering the evidence, the court terminated the parents' reunification services, finding the parents had not made substantive progress with the provisions of the case plan.

The court set a section 366.26 permanent plan hearing for December 30, 2014. On that date the parents requested a trial and the court continued the matter to March 2015 for a contested section 366.26 hearing.

F. *Parents' Section 388 Petitions for Modification*

1. *Father's petition*

In late February 2015 the father filed a section 388 petition seeking reinstatement of reunification services. The father alleged he had made substantial progress in his domestic violence program, counseling, and drug treatment following the court's termination of reunification services. He also alleged he had completed parenting classes, tested negative for drugs, and visited with A.R. regularly. He asserted that

11

renewing his reunification services was in A.R.'s best interest because it would help "facilitate the father[-]child bond" and it would increase the likelihood A.R. could be placed with him.

In support of his petition, the father attached proof of his attendance at Narcotics Anonymous meetings and of several negative drug tests, and a paycheck.

Finding that the father had made a prima facie showing on his section 388 petition, the court set an evidentiary hearing on the petition to coincide with the contested section 366.26 hearing.

2. *Mother's petition*

In late February 2015 the mother also filed a section 388 petition seeking reinstatement of reunification services. She alleged as changed circumstances that she was enrolled in Job Corps, she was finishing high school, and she was re-entering dependency as a "NonMinor Dependent." She asserted her requested change in the court order terminating her reunification services was in A.R.'s best interest because it would "facilitate the possibility [that A.R.] ma[y] reunify with her mother and enjoy the natural relationship into which she was born." The mother also asserted the renewal of her reunification services would not disturb A.R.'s placement with the maternal grandparents. She attached letters and records from Job Corps to her petition.

G. *Combined Contested Hearing on the Parents' Section 388 Petitions and Contested Section 366.26 Hearing*

At the March 3, 2015, combined contested hearing, over the objection of A.R.'s counsel, the court found the mother had made a prima facie showing on her section 388

12

petition and added her petition to the contested issues, in addition to the father's section 388 petition and the Agency's recommendation for termination of parental rights and adoption. Evidence presented with respect to the section 388 petition was also considered with respect to the section 366.26 issues.

1. *Contested hearing on the section 388 petitions*

The court received into evidence the attachments to the parents' section 388 petitions. It also received into evidence all of the reports the Agency submitted in this case, as well as the curriculum vitae of social worker Stephannie Novitski, who did not testify but was present at the hearing.

In an addendum report, the Agency assessed each parent's section 388 petition. Regarding the father's petition, the Agency reported that the father told social worker Novitski his drug tests were not performed randomly; he performed drug tests at his own request. The father admitted the length of time between tests ranged from one or two weeks to up to a month. Novitski opined there would be sufficient time for any indication of drug use to exit the father's system, and thus she was unable to assess whether he was benefitting from drug treatment. He was still working on completing his domestic violence classes, so his attendance only indicated he was still in the process of changing.

Regarding the mother's section 388 petition, the Agency reported that while she was progressing in her educational and career goals, the services she was performing did not address the reasons A.R. was brought into protective custody. In the report social worker Novitski stated, "There is no indication that she completed any of those services

to mitigate the original protective issue or has been able to verbalize . . . how she would mitigate future risk."

The Agency called the father as its witness. The father testified that the day prior to the trial, his drug treatment counselor put him on a contract because he missed two weeks at his program. He admitted he did not have any excuse for missing those sessions.

On cross-examination by his counsel, the father explained he visited with A.R. twice per week at a library. Twice a week he played with her, read to her and sang to her for one hour. He brought to the visits diapers, wipes, and occasionally clothes and toys. He attempted to make up any visits he missed due to work. He enjoyed his visits and was amenable to expanding them. The father stated he did not have a relationship with the mother and denied contacting her after the court terminated his reunification services.

The father also testified about the services he was participating in. He stated he completed 46 out of 52 domestic violence classes and attended once or twice a week. He explained he drug tested once or twice per week, the tests were not random, and all tests were negative. Through the drug treatment program, he learned he had to look at himself, humble himself, and accept he had no power or control over drugs; he also learned he needed to refrain from using drugs and change his friends. He planned to start school to become a paramedic, and currently he was employed in construction. He also attended two to five Narcotics Anonymous meetings each week and had a sponsor. He was working on the first recovery step, and he also attended therapy once per week.

The mother testified on her own behalf that she could not avail herself of the reunification services or visit A.R. because she was working and had unstable housing. She was 20 years old and acknowledged she did not have a stable relationship with A.R., which she attributed to "transportation issues." When she did attend a visit, it went well and she and A.R. were affectionate. She stated she wished the court would select a less permanent plan for A.R., such as guardianship.

a. *Rulings*

The juvenile court denied both parents' section 388 petitions. As to the mother's petition, the court found that although the mother was participating in the Job Corps program, she was not addressing the parenting, domestic violence, and psychological issues that she needed to address. The court found the mother's participation in Job Corps did not constitute a change of circumstance that would warrant modification of court's order terminating her reunification services. The court also found she had failed to show such modification would be in A.R.'s best interest.

With respect to the father's section 388 petition, the court found he did participate in services such as parenting education, drug treatment, domestic violence, and therapy. However, the court also found what was lacking in the father's case was evidence he was actually progressing in his services, developing insight, and remedying the problems that brought him before th`e juvenile court. Stating that "circumstances appear to be changing, but not changed," the court found the father had presented "no evidence . . . that the issues that brought [A.R.] before the court [were] ameliorated and that [the] father's circumstances [were] changed such that it would be in the best interest

15

of [A.R.] to reorder reunification services to the 18[-]month date, which, as [A.R.'s] counsel points out, is shortly before us [on] May 13, 2015."

2. *Contested section 366.26 hearing*

For the section 366.26 portion of the hearing, the father testified he tried to remain involved in A.R.'s life since her birth and he felt they had a special bond. She called him "dada" and appeared to enjoy their visitation time.

Social worker Novitski prepared the Agency's section 366.26 report. On the Agency's behalf she recommended the court terminate parental rights and order adoption as A.R.'s permanent plan. A.R. was healthy and was developmentally on target. A.R. was specifically adoptable because the caregivers were devoted to adopting her and taking the necessary steps to do so. She was generally adoptable because 89 other families in San Diego were interested in adopting a child with A.R.'s characteristics.

Novitski reviewed the parents' history of contact with A.R. Initially both parents visited A.R. with supervision twice each per week for one hour per visit. The mother held A.R. and played with her, but she did not bring supplies to the visits and had been inconsistent in visiting her. On December 8, 2014, A.R.'s caregiver reported that the mother had not visited A.R. since August 26 of that year.

Novitski observed three visits between the father and A.R. A.R. went to the father easily, but at times sought out the caregiver. The father played with A.R. and engaged with her. He brought snacks and supplies for her. A.R. appeared comfortable in his care. He did not redirect her when she stood on a chair several times during a visit. When the

16

visits ended A.R. went to her caregiver, waved goodbye to the father, and did not appear upset.

Novitski opined that neither parent had a parental relationship with A.R. The mother had not consistently visited A.R. and had not demonstrated she could put A.R.'s needs above her own.

The father was consistent with visitation and brought items for A.R. He engaged with A.R. but was timid in setting boundaries with her. During some visits the caregiver stepped to redirect A.R. for her safety. It appeared the father did not take his substance abuse treatment seriously. He did not complete a treatment program and he had only recently started attending Narcotics Anonymous meetings. Like the mother, he had not demonstrated he could elevate A.R.'s needs above his own. A.R. did not appear to be upset when her visit with the father was over. She willingly went back to the caregiver and separated easily from the father. Novitski opined that adoption was the best plan for A.R. so that she could have stability and security and have all her needs met.

a. *Ruling*

After considering the documents and testimony, the court followed the Agency's recommendations. By clear and convincing evidence, the court found A.R. would be adopted if parental rights were terminated, and none of the circumstances listed in section 366.26, subdivision (c)(1) that would make termination of parental rights detrimental to A.R. existed in this case. The court determined the mother had not visited the child regularly. The court further found that A.R. had not been parented by the mother since

17

she was three months old. The mother's relationship with A.R. was not a parental bond; it was only a bond of familiarity.

Regarding the father, the court found by clear and convincing evidence that none of the circumstances listed in section 366.26, subdivision (c)(1) that would make termination of parental rights detrimental to A.R. existed in this case. The court found he visited A.R. consistently and it was clear he loved her. However, he, like the mother, did not have a parental relationship with A.R. His visits had remained supervised.

The court further found by clear and convincing evidence that it was in A.R.'s best interest to be adopted. The court stated that A.R. was "just one year[] old and deserve[d] permanency, deserve[d] to be safe and protected, and the current caregivers [were] ready and willing to do that."

Accordingly, the court terminated parental rights and referred A.R. to the Agency for adoption. The parents' appeals followed.

## DISCUSSION

### I. *THE COURT PROPERLY DENIED THE PARENTS' SECTION 300 PETITIONS*

In support of their contentions the court abused its discretion when it denied their separate section 300 petitions for reinstatement of reunification services, both parents assert the evidence showed a substantial change of circumstances and that it was in A.R.'s best interest to continue her relationship with them. We conclude the court acted within its lawful discretion in denying the parents' section 388 petitions.

A.  *Applicable Legal Principles*

1.  *Section 388*

"Under section 388, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances or new evidence."  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188; § 388, subd. (a).[2])

At the hearing on a section 388 petition, the petitioner has the burden of showing by a preponderance of the evidence that (1) there is a change of circumstances or new evidence, *and* (2) the requested modification would be in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).)

Whether there is a change in circumstances or new evidence that makes the requested modification in the best interests of the child "is determined by the seriousness of the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be

---

[2]     Section 388, subdivision (a) provides that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of *change of circumstance* or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . ."  (Italics added.)  That subdivision also provides that the petition, "if made by a person other than the child . . . shall set forth in concise language any *change of circumstance* or new evidence that is alleged to require such change of order or termination of jurisdiction."  (Italics added.)

19

achieved, and the reason it did not occur sooner." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685.)

"[T]he petitioner must show *changed*, not changing, circumstances." (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 (*Casey D.*).)

The California Supreme Court has explained that "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability," and the juvenile court "need not continue to consider the issue" at the section 366.26 permanent plan selection and implementation hearing. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).) "The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue." (*Ibid*.)

Thus, a section 388 petition filed on the eve of a section 366.26 hearing, like an oral motion made under section 388 at the time of the section 366.26 hearing, is disfavored. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594 (*Edward H.*) ["on the eve of the section 366.26 permanency planning hearing—the children's interest in stability was the court's foremost concern and outweighed any interest in reunification"]; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 609 ["the court is not required to entertain an oral motion under section 388 at the time set for the [section] 366.26 hearing"].)

2. *Standard of review*

The juvenile court is vested with broad discretion in determining what will be in the best interest of a child and, when a court has made a custody determination in a dependency proceeding, "'"a reviewing court will not disturb that decision unless the trial

20

court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."'" (*Stephanie M., supra,* 7 Cal.4th at p. 318.) "'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M., supra,* 103 Cal.App.4th at pp. 685-686.)

"'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Stephanie M., supra,* 7 Cal.4th at pp. 318-319.)

B. *Analysis*

1. *Mother's petition*

The court did not abuse its broad discretion when it found the mother had failed to meet her burden of showing either that there was a change of circumstances warranting modification of the court's order terminating her reunification services, or that the modification would be in A.R.'s best interest. We begin our analysis by noting the mother's petition is disfavored under the law. A section 388 petition filed on the eve of a section 366.26 hearing is disfavored because at this stage of the dependency proceedings, after the termination of reunification services, the child's interest in permanency and stability is the court's foremost concern and generally outweighs any interest in

21

reunification.  (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309; *Edward H.*, *supra*, 43 Cal.App.4th at p. 594.)

Here, the mother's section 388 petition is disfavored because she filed it on February 27, 2015, almost six months after the court terminated her reunification services on September 4, 2014, and only a few days before the contested section 366.26 hearing on March 3, 2015.

The mother contends the court erred in denying her petition because the change of circumstances she pleaded in her petition—her enrolling in Job Corps, finishing high school, and re-entering dependency as a non-minor dependent—was relevant to the dependency proceedings in that "it could resolve her financial dependence on an abusive boyfriend."

This contention is unavailing because, while the mother's pursuit of her educational and vocational goals is laudable, the record shows she has made little effort to address the reasons why A.R. was declared a dependent of the juvenile court and why the mother's reunification services were terminated.  A.R. became a dependant of the court as a result of A.R.'s exposure to the domestic violence in the parents' relationship and their demonstrated inability to adequately supervise A.R.  To address those problems, the mother's reunification case plan required her to participate in a domestic violence victim program, a psychological evaluation, individual counseling, and parent education. At the September 2014 contested six-month status review hearing at which the court terminated the mother's reunification services, the court determined she had not made substantive progress with the provisions of her case plan.  The Agency's July 2014 six-

22

month status review report reported that the mother had not been meeting with the assigned social worker to talk about her case, and the mother had failed to participate in any of the services, with the exception of the psychological evaluation. The report also showed the mother had not consistently visited A.R. during the preceding six months. In its September 2014 addendum report, the Agency reported that the mother had not visited A.R. since June 24 and she had told the social worker she was no longer interested in participating in reunification services.

A petitioner seeking relief under section 388 must show *changed*, not changing, circumstances. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Here, the foregoing substantial evidence supports the court's finding that the mother had failed to meet her burden of showing a change of circumstances warranting modification of the court's order terminating her reunification services. We conclude the court acted within its legal discretion in denying the mother's section 388 petition because the evidence shows, at best, that the mother's circumstances were merely changing, and thus A.R.'s interest in permanency and stability outweighed the mother's interest in last-minute reinstatement of reunification services.[3]

2. *Father's petition*

The father's section 388 petition, like the mother's, is disfavored under the law because he filed it on the eve of the section 366.26 hearing. (See *Marilyn H.*, *supra*, 5

---

3      In light of our conclusion, we need not, and do not, address the mother's claim the court erred in finding she had failed to show that reinstatement of reunification services would be in A.R.'s best interest.

23

Cal.4th at p. 309; *Edward H.*, *supra*, 43 Cal.App.4th at p. 594.) The father filed his petition on February 25, 2015, almost six months after the court terminated his reunification services on September 4, 2014, and only a few days before the contested section 366.26 hearing was held on March 3, 2015.

We conclude the court did not abuse its discretion when it found the father had failed to meet his burden of showing that there was a change of circumstances warranting modification of the court's order terminating his reunification services, or that the reinstatement of those services would be in A.R.'s best interest. The father's reunification case plan required him to participate in a 52-week domestic violence program, psychological evaluation if recommended by his therapist, individual counseling, parent education, and an outpatient substance abuse program. The father acknowledges that at the time of the contested six-month review hearing (early September) at which the court terminated his reunification services, his social worker did not see any significant behavioral changes, his drug treatment counselor reported he was not making progress, and he was again living with the mother although his therapist advised that the father needed to maintain healthy boundaries with her.

In an addendum report, the Agency reported the father had told the social worker his drug tests were not randomly performed and the length of time between tests ranged from one or two weeks to up to a month. The social worker opined there would be sufficient time for any indication of drug use to exit the father's system, and thus she was unable to assess whether he was benefitting from drug treatment. She also reported the

24

father was still working on completing his domestic violence classes, so his attendance only indicated he was still in the process of changing.

At the hearing on the parents' section 388 petitions, the Agency called the father as a witness. The father testified he had seen his drug treatment counselor the day before and the counselor had put him on a contract because he had missed two weeks at his program. The father admitted he did not have any excuse for missing those sessions. On cross-examination, the father testified he was drug testing once or twice each week and the results had been negative, but he acknowledged the test were not random.

As already discussed, a petitioner seeking relief under section 388 must show *changed*, not changing, circumstances. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) We conclude substantial evidence supports the court's finding that the father had failed to meet his burden of showing a change of circumstances warranting modification of the court's order terminating his reunification services. We also conclude the court acted within its legal discretion in denying the father's section 388 petition because the evidence shows the father's circumstances were changing, but had not changed, and thus A.R.'s interest in permanency and stability outweighed his interest in last-minute reinstatement of reunification services.

II. *THE COURT PROPERLY TERMINATED THE FATHER'S PARENTAL RIGHTS*

The father also contends the court erred in terminating his parental rights because the evidence showed A.R. had a beneficial parent-child relationship with him that

outweighed any need for adoption.[4]  He also asserts the court should have ordered a permanent plan of legal guardianship because it "would provide the stability [A.R.] needed, while at the same time maintain her relationship with [him]."  We conclude the court acted within its lawful discretion in terminating the father's parental rights.

A.  *Applicable Legal Principles*

1.  *Beneficial parent-child relationship exception*

When reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child.  (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.)  At the section 366.26 permanent plan selection and implementation hearing, the juvenile court has three options:  (1) Terminate parental rights and order adoption as the permanent plan, (2) appoint a legal guardian for the dependent child, or (3) order the child placed in long-term foster care.  (*In re Fernando M*., p. 534.)

"Adoption . . . is the permanent plan preferred by the Legislature."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)  Thus, "[i]f the child is adoptable, there is a strong preference for adoption over alternative permanency plans."  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588 (*Michael G.*).)  All that is required to show a dependent child is adoptable is "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time."  (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; see

---

4      Neither parent has challenged the court's finding by clear and convincing evidence that A.R. was adoptable and would be adopted if parental rights were terminated.

26

§ 366.26, subd. (c)(1).)  The issue of adoptability focuses on the child and "whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child."  (*Michael G.*, *supra*, at p. 589; *In re Zeth S.*, at p. 406.)

At a section 366.26 hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan "unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivisions (c)(1)(A) and (B)."  (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589; *In re Erik P*. (2002) 104 Cal.App.4th 395, 401.)

The beneficial parent-child relationship exception found in section 366.26(c)(1)(B)(i) provides an exception to the adoption preference if the juvenile court finds a "compelling reason" for determining that termination of parental rights would be "detrimental" to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would *benefit from continuing the relationship*."  (§ 366.26(c)(1)(B)(i), italics added.)

This court has interpreted the statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) to mean that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  We explained in *Autumn H.* that in determining whether the child would benefit from continuing the parent-child relationship for purposes of the beneficial parent-child relationship exception, the juvenile court "balances the strength

27

and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive emotional attachment* such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*, italics added; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of establishing the applicability of the beneficial parent-child relationship exception, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The beneficial parent-child relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid.*) Thus, "[t]he parent must show he or she occupies a parental role in the child's life." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *Derek W.*, at p. 827.)

Furthermore, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to *some* degree, but that does not meet the child's need for a

28

parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, second italics added; accord, *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 (*Marcelo B.*).)

 2. *Standard of review*

 On review of the sufficiency of the evidence to support a juvenile court's order terminating parental rights and freeing the parent's child for adoption, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "We must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence." (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

 "The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*Ibid.*)

 B. *Analysis*

 As discussed, *ante*, a parent seeking to avoid the termination of parental rights and overcome the statutory preference for adoption under the beneficial parent-child relationship exception must show (1) he or she has maintained regular visitation with the child, and (2) the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.) The parent must show more

29

than frequent and loving contact, an emotional bond with the child, or pleasant visits; the parent must show he or she occupies a parental role in the child's life. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; *Derek W.*, 73 Cal.App.4th at p. 827.)

Here, County Counsel acknowledges the father met his burden of satisfying the visitation prong of the beneficial parent-child relationship exception, but argues the court properly found he failed to meet his burden of showing he occupied a parental role in the A.R.'s life. We agree.

The record shows the father maintained regular visitation with A.R., he loves and has an emotional bond with her, and his visits with her were pleasant. However, substantial evidence supports the court's finding that the father did not occupy a parental role in A.R.'s life. The court found, and the father does not dispute, that A.R. had been living with her caregivers since January 10, 2014, and the father's visitation had remained supervised and thus had never progressed to a period of unsupervised visitation "wherein a parental bond or parental role with [her] could be determined." In the Agency's report for the section 366.26 hearing, the social worker reported that although the father engaged with A.R. during visitation, he was timid in setting boundaries with her and the caregiver would step in to redirect A.R. for her safety. When visitation ended, A.R. willingly went to the caregiver without crying or demonstrating she did not want to leave the father. The social worker also reported that the father did not take his substance abuse treatment seriously. The court agreed with the social worker's opinion that the parents did not have a parental relationship with A.R., and adopted the Agency's

30

recommendation that parental rights be terminated and A.R. referred to the Agency for adoption. The court did not err.

## DISPOSITION

The orders and judgments are affirmed.


NARES, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.